## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

———————————————————————— )
PETERBOROUGH OIL COMPANY, INC., )
and DIANE CLARK, )
     )
    **Plaintiffs,** )
     )
    **v.** )    **04-40252-FDS**
     )
GREAT AMERICAN INSURANCE )
COMPANY, )
     )
    **Defendant.** )
————————————————————————)

## MEMORANDUM AND ORDER ON
## CROSS-MOTIONS FOR SUMMARY JUDGMENT

**SAYLOR, J.**

    This is a dispute over the scope of a liability insurance policy.  Plaintiffs Peterborough Oil Company and Diane Clark, an employee of Peterborough Oil, allege that defendant Great American Insurance Company wrongfully failed to defend and indemnify them in a tort action brought in state court.

    Peterborough Oil was the insured under a commercial general liability policy issued by Great American.  During the term of the policy, Cheryl Carter, a former employee of Peterborough Oil, brought suit against Peterborough Oil and Clark, alleging malicious prosecution and intentional infliction of emotional distress.  Great American denied coverage.  A jury awarded $300,000 in damages against Peterborough Oil.

    Plaintiffs assert claims in this action against Great American for breach of contract and for unfair and deceptive acts or practices in violation of Mass. Gen. Laws ch. 93A and 176D.  Currently pending before the court are the parties' cross-motions for summary judgment.  For the

reasons explained below, the court concludes that Great American had a duty to defend and indemnify, but did not engage in unfair or deceptive acts or practices. Accordingly, plaintiffs' motion for summary judgment will granted in part and denied in part, and defendant's motion will be granted in part and denied in part.

I.    **Background**[1]

A.    **The Parties**

Peterborough Oil Company is a New Hampshire corporation with its principal place of business in Leominster, Massachusetts. Peterborough Oil owns and operates Mobil gas stations in Massachusetts, including a gas station and convenience store named Mr. Mike's in Groton, Massachusetts. At all relevant times, Diane Clark, who is a citizen of New Hampshire, was a managerial employee of Peterborough Oil.

Great American Insurance Company is an Ohio corporation with its principal place of business in Ohio. Great American provided Peterborough Oil with commercial general liability insurance coverage for the period from September 30, 1998, through September 30, 1999.

Cheryl Carter is a former employee of Peterborough Oil. Carter worked at Mr. Mike's in Groton, first as a cashier, then as an assistant manager, and ultimately as a manager.

B.    **The Discovery of the Cash Shortage and Subsequent Proceedings**

On January 21, 1999, Carter reported to Peterborough Oil that Mr. Mike's in Groton had suffered cash shortages. Clark thereafter appeared at the station on behalf of Peterborough Oil. Later that day, she contacted the Groton Police Department and reported larceny of $6,020 by an

---

[1] The facts relevant to resolving the cross-motions for summary judgment are not in dispute. In order to provide additional context, this opinion includes facts alleged by Carter in her state court complaint against the plaintiffs, the accuracy of which is not necessarily conceded by the plaintiffs.

employee.  Clark further reported to the police that she thought Carter was the guilty employee.

The Groton police interviewed Carter, who attributed the missing amounts to cash drawer shortages, "speed pass" (electronic payment) problems, and differences in gas prices.  On the same day, January 21, Carter was suspended without pay from her employment duties.  She never actively worked for Peterborough Oil again.  Peterborough Oil terminated her employment on February 16, 1999.

The premises of Mr. Mike's had surveillance cameras in several locations, including one focused on the cash register and the area where the cashier normally worked.  Prior to leaving the premises of Mr. Mike's on January 21, 1999, Carter removed and took with her a surveillance tape covering the prior day, January 20.

On February 22, Carter filed a complaint with the Office of the Massachusetts Attorney General alleging that Peterborough Oil was unlawfully withholding her paycheck for her final weeks.  Shortly thereafter, Clark, on behalf of Peterborough Oil, filed criminal charges against Carter in the Ayer District Court, accusing her of larceny over $250 in violation of Mass. Gen. Laws ch. 266, § 30.

A probable cause hearing was held in the District Court before a clerk-magistrate on April 14, 1999.  The hearing was continued without a finding to another date to allow both parties to review the relevant records of Mr. Mike's.  On May 17, according to the complaint, after a review of the records, the parties "mutually concluded that the cash shortages were due to someone playing scratch lottery tickets without paying for them."

On the evening of May 17, 1999, Carter and her husband reviewed the surveillance tape covering January 20.  The tape showed that another cashier at Mr. Mike's was repeatedly playing

lottery scratch tickets without paying for them.

On May 20, 1999, the Massachusetts Division of Employment and Training held a hearing regarding Carter's eligibility for unemployment compensation benefits. Immediately prior to the hearing, counsel for Carter advised Clark and counsel for Peterborough Oil that he was in possession of a surveillance tape that implicated someone other than Carter in the theft. Counsel for Carter also advised Clark and counsel for Peterborough Oil that if they ignored that evidence and continued to prosecute Carter for larceny, they could be liable for malicious prosecution. Carter's counsel offered to play the surveillance tape, but they refused to view it. Clark did indicate, however, that she would like a copy of the surveillance tape.

On May 21, 1999, the probable-cause hearing before the clerk-magistrate of the Ayer District Court resumed. Clark was present as the representative for Peterborough Oil. Counsel for Carter informed the clerk-magistrate and a Groton police officer of the existence and contents of the surveillance tape. The police officer asked Clark what she wanted to do. Clark advised the police officer and clerk-magistrate that she still wanted Carter to be prosecuted for larceny.

On June 14, 1999, Clark and Peterborough Oil were given a copy of the tape. On June 24, at the request of Peterborough Oil and Clark, a criminal complaint was issued against Carter for larceny over $250. On July 7, the Massachusetts DET issued its written decision regarding Carter's application for benefits. According to the complaint, the allegation of theft "was summarily dismissed by the DET: 'while the employer may feel that the claimant [Carter] embezzled or otherwise took the money in question in some fashion, the evidence does not support that position.'" On August 11, Carter was arraigned in Ayer District Court on the charge; she pleaded not guilty.

A criminal trial was held in Ayer District Court on March 6-8, 2000. At the trial, counsel for Carter played the relevant portions of the surveillance tape to the jury. Clark testified on behalf of the Commonwealth. On March 8, 2000, Carter was found not guilty.

### C.    The Massachusetts Civil Lawsuit

Carter then filed suit against Peterborough Oil and Clark in Superior Court, alleging malicious prosecution and intentional infliction of emotional distress. With respect to the malicious prosecution claim, Carter alleged that Peterborough Oil and Clark initiated criminal proceedings without probable cause and for an improper purpose and that they took an active part in continuing or procuring the continuation of those proceedings. Carter further alleged that Peterborough Oil and Clark never viewed the surveillance tape prior to its being shown at trial, never viewed the other six surveillance tapes for the week prior to January 21, 1999, and never had an independent audit performed regarding the apparent cash shortages. The jury found against Peterborough Oil and awarded $300,000 in damages to Carter. The jury found in favor of Clark. Peterborough Oil has appealed the judgment.

### D.    The Insurance Policy

The policy under which Great American insured Peterborough Oil provides, among other things, coverage for "'personal injury' caused by an offense arising out of [its] business." Commercial General Liability Coverage Form, Coverage B, ¶ 1(b)(1). "Personal injury" is defined as an "injury, other than 'bodily injury,' arising out of one or more of the following offenses: . . . malicious prosecution." *Id.*, Section V, ¶ 13(b).[2] The policy provides that the

---

[2] The full definition is as follows:

"Personal injury" means injury, other than "bodily injury," arising out of one or more of the

insurer will "pay those sums that the Insured becomes legally obligated to pay as damages because of 'personal injury' . . . to which this insurance applies" and that the insurer would "have the right and duty to defend the Insured against any 'suit' seeking those damages." *Id.*, Coverage B, ¶ 1(a).

An endorsement to the policy, entitled "Employment-Related Practices Exclusion," states that the policy "does not apply" to "[p]ersonal injury" to:

> a person arising out of any:
>
> 1.   refusal to employ that person;
>
> 2.   termination of that person's employment; or
>
> 3.   employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, decipline [*sic*], defamation, harassment, humiliation, discrimination directed at that person.

¶ B(1).  Further, this exclusion applies "whether the Insured may be liable as an employer or in any other capacity."  *Id.*

---

following offenses:

> a.   false arrest, detention or imprisonment;
>
> b.   malicious prosecution;
>
> c.   the wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies by or on behalf of its owner, landlord or lessor;
>
> d.   oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services; or
>
> e.   oral or written publication of material that violates a person's right of privacy.

*Id.*

6

E.    **The Insurance-Coverage Dispute**

Peterborough Oil promptly notified Great American of Carter's suit, provided it with a copy of the summons and complaint, and demanded that Great American fulfill its perceived defense and indemnity obligations.  Relying on the employment-related practices exclusion, Great American denied coverage.  In March 2004, Peterborough Oil notified Great American of the approaching trial date and again demanded that Great American fulfill its defense and indemnity obligations.  Great American once more disclaimed coverage under the policy.  On September 28, 2004, Peterborough Oil notified Great American of its duty to defend and indemnify Peterborough Oil relative to the appeal and the judgment entered against Peterborough Oil.  Great American again disclaimed coverage in a letter dated October 29, 2004.

On November 9, 2004, Peterborough Oil and Clark filed a complaint in Worcester Superior Court.  Plaintiffs asserted three counts against Great American:  (1) breach of the duty to defend, (2) breach of the duty to indemnify, and (3) unfair claims practices in violation of Mass. Gen. Laws ch. 93A and 176D.  Plaintiffs seek recovery of the attorneys' fees incurred by Peterborough Oil and Clark in defending the Carter case through the date of judgment; a declaratory judgment that Great American must indemnify Peterborough Oil for the judgment entered against Peterborough Oil in the Carter case; a declaratory judgment that Great American must pay for Peterborough Oil's prosecution of the appeal from that judgment; the attorneys' fees incurred by Peterborough Oil in pursuing this case; and double or treble damages for Great American's knowing and willful violations of Chapter 93A.

On November 24, 2004, Great American filed a Notice of Removal and removed the case to the United States District Court for the District of New Hampshire.  Shortly thereafter, on

7

December 1, 2004, Great American filed an assented-to motion to transfer the case to this Court, which the New Hampshire court granted on December 2, 2004.

Currently pending before the court are cross-motions for summary judgment filed by the plaintiffs and Great American. The record consists of the insurance policy issued by Great American to Peterborough Oil, various filings in the Carter case, and correspondence between Great American (or its counsel) and counsel for Peterborough Oil.

## II.    Analysis

### A.    Standard for Summary Judgment

The role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Mesnick v. General Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991) (quoting *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir. 1990)). The burden is upon the moving party to show, based upon the pleadings, discovery, and affidavits, "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

Once the moving party has satisfied its burden, the burden shifts to the non-moving party to set forth specific facts showing that there is a genuine, triable issue. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). The court must view the entire record in the light most hospitable to the non-moving party and indulge all reasonable inferences in that party's favor. *O'Connor v. Steeves*, 994 F.2d 905, 907 (1st Cir. 1993). Here, no genuine issue as to any material fact exists, making summary judgment appropriate.

### B.    Whether Great American Had a Duty to Defend the Carter Lawsuit

#### 1.    General Principles of Construction

8

Under Massachusetts law,[3] an insurance policy is ordinarily construed according to general principles of contract interpretation. *Brazas Sporting Arms, Inc. v. American Empire Surplus Lines Ins. Co.*, 220 F.3d 1, 4 (1st Cir. 2000). The court begins with "the actual language of the polic[y], given its plain and ordinary meaning." *Id.*; *see also Bagley v. Monticello Ins. Co.*, 430 Mass. 454, 457 (1999) ("Words in exclusionary clauses of insurance contracts should be construed in their usual and ordinary sense."). The court must "consider what an objectively reasonable insured, reading the relevant policy language, would expect to be covered." *Brazas Sporting Arms*, 220 F.3d at 4 (internal quotation omitted).

A liability insurer owes a broad duty to defend its insured against any claims that create a potential for indemnity. *Doe v. Liberty Mut. Ins. Co.*, 423 Mass. 366, 368-69 (1996). Great American was required to defend Peterborough Oil if the allegations in the underlying Carter suit were reasonably susceptible of an interpretation that they stated a claim covered by Peterborough Oil's policy. *See Brazas Sporting Arms*, 220 F.3d at 4. The duty to defend is broader than the duty to indemnify: "the obligation to defend turns on the facts alleged in the complaint rather than the facts proven at trial." *Id.*

A liability insurer has no duty to defend a claim that is excluded from coverage. *Metropolitan Prop. & Cas. Ins. Co. v. Fitchburg Mut. Ins. Co.*, 58 Mass. App. Ct. 818, 820 (2003). Great American, however, bears the burden of establishing that an exclusion applies. *Id.* An exclusion should be read narrowly, and any ambiguities in an exclusion are strictly construed against Great American. *Bravas Sporting Arms*, 220 F.3d at 4-5; *Hakim v. Massachusetts Insurers' Insolvency Fund*, 424 Mass. 275, 281-282 (1997) ("'[E]xclusions from coverage are to

---

[3] The parties apparently agree that Massachusetts law governs the dispute.

9

be strictly construed,' and any ambiguity in the exclusion 'must be construed against the insurer.'") (quoting *Vappi & Co. v. Aetna Cas. & Sur. Co.,* 348 Mass. 427, 431 (1965)). "Ambiguity exists when the policy language is susceptible to more than one rational interpretation. But it does not follow that ambiguity exists solely because the parties disagree as to the provision's meaning. " *Bravas Sporting Arms,* 220 F.3d at 4-5 (internal citations omitted).

### 2.    <u>Whether the Exclusion Applies</u>

As noted, the policy generally covers a "personal injury" caused by an "offense arising out of [Peterborough Oil's] business."[4] "Personal injury" is defined to include an injury "arising out of . . . malicious prosecution."[5]

For purposes of this motion, there is no dispute that the policy covers Clark in her role as a manager of Peterborough Oil; that the Carter lawsuit alleged an injury "arising out of" an act of malicious prosecution; that Carter's malicious-prosecution claim arose out of the business of Peterborough Oil; or that, but for the exclusion, the policy covers the claim.

The dispute thus focuses on whether the exclusion applies to bar coverage of Carter's claim. The exclusion, in relevant part, provides that the policy does not apply to any "[p]ersonal injury" to a person "arising out of" any "termination of that person's employment" or any "employment-related . . . acts or omissions, such as coercion, demotion, evaluation, reassignment,

---

[4] Although Clark is covered by the policy, for the sake of simplicity, this opinion will refer to the insured simply as "Peterborough Oil."

[5] Great American points out that the policy does *not* provide coverage for Carter's claim for intentional infliction of emotional distress. Plaintiffs apparently do not contest that fact. The point is largely irrelevant, however, for purposes of analyzing the duty to defend: if Great American had a duty to defend Carter's malicious-prosecution claim, it had a duty to defend the entire lawsuit. *See Mt. Airy Ins. Co. v. Greenbaum*, 127 F.3d 15, 19 (1st Cir. 1997).

discipline [*sic*], defamation, harassment, humiliation, discrimination directed at that person."[6]  The exclusion applies if the injury to Carter (caused by the malicious prosecution) arose out of the termination of Carter's employment, or out of an employment-related act or omission.

The court will first consider the latter exclusion, which is the broader of the two.  The question of whether either exclusion applies depends on whether the language is susceptible to more than one rational interpretation given the circumstances.

### a.    Whether the Injury Arose Out Of an Employment-Related Act or Omission

As noted, the broader exclusion provides that the policy does not apply to any injury "arising out of" any "employment-related . . . acts or omissions . . . ."  There are two key phrases to be interpreted, "arising out of" and "employment-related acts or omissions."

### (1)    The Meaning of "Arising Out Of"

The term "arising out of" has been the subject of considerable judicial interpretation.  According to the First Circuit, "Massachusetts case law instructs that the term 'arising out of' should be broadly construed" to "'indicate[] a wider range of causation than the concept of proximate causation in tort law.'"  *Brazas Sporting Arms*, 220 F.3d at 6-7 (quoting *Rischitelli v. Safety Ins. Co.*, 423 Mass. 703, 704 (1996)).  The term "falls somewhere between proximate and 'but for' causation—an intermediate causation standard"—and "is generally understood to mean 'originating from,' 'growing out of,' 'flowing from,' 'incident to,' or 'having connection with.'"  *Id.* at 7.

Nevertheless, despite the broad construction that must be given to the expression, it does

---

[6] The exclusion also applies to employment-related "practices" and "policies."  There has been no suggestion by either party that the prosecution was the result of a practice or policy at Peterborough Oil.

not capture all events between which a causal connection may be drawn, no matter how tenuous. *See Rischitelli*, 423 Mass. at 704 (explaining that the term in the context of automobile insurance coverage "does not refer to all circumstances in which the injury would not have occurred 'but for' the involvement of a motor vehicle").

### (2)    The Meaning of "Employment-Related Act or Omission"

The phrase "employment-related act or omission" is not defined in the policy. As an initial matter, it seems clear that "employment-related" cannot be synonymous with "related to an employee" or "involving an employee." A corporate employer can only act through human agents, principally its employees. If every injury arising out of an act that somehow related to an employee were to be excluded, the exclusion would effectively swallow the coverage. The term is therefore necessarily narrower.

For similar reasons, the term "employment-related" cannot mean either "undertaken *by* an employee in the course of employment" or "occurring *to* an employee in the course of employment." The former interpretation would exclude virtually all coverage; again, a corporation can only act through its employees and agents. The latter would exclude virtually all claims brought by employees; while that interpretation is certainly narrower than a total exclusion, it is nonetheless quite sweeping, and achieves that end by a convoluted path. It would be simple enough to provide that "all claims brought by employees are excluded," if that was the intent of the drafters.

What, then, would the insured reasonably expect the term "employment-related" to mean in this context? One clue lies in the nine examples of "employment-related" acts or omissions (or practices or policies) set forth in the exclusion: coercion, demotion, evaluation, reassignment,

12

discipline, defamation, harassment, humiliation, and discrimination.  That list consists almost entirely of events that concern the relationship between an employer and an employee—in other words, not events in the workplace generally, or events concerning the job duties of an employee, but events concerning personnel management, employee discipline, and similar matters.  A second clue derives from the two other provisions of the exclusion, one of which excludes injuries arising out of a "refusal to employ" a person (i.e., hiring), and one of which excludes injuries arising out of the "termination of [a] person's employment " (i.e., firing).

Taken together, both clues strongly suggest the common-sense conclusion that the term "employment-related" has a relatively narrow meaning:  it is intended to refer to matters that directly concern the employment relationship itself, such as the demotion, promotion, or discipline of employees by employers, and tortious acts that may accompany such personnel decisions, such as discrimination, harassment, or defamation.  Conversely, it is not intended to refer to all matters that concern or relate to employees.

The question then arises whether an act can be "employment-related" if it occurs after the termination of the employment relationship.  Four of the nine examples given (demotion, evaluation, reassignment, and discipline) can occur, as a practical matter, only within the context of an ongoing employment relationship.  Four others (coercion, harassment, humiliation, discrimination) occur almost exclusively in the context of prospective or ongoing employment.  Defamation of an employee, however, often occurs after employment has concluded, such as where an employer defames a former employee in connection with a job reference, or because the employee has left to work for a competitor. *See, e.g., Parish of Christ Church v. Church*

13

*Insurance Co.*, 166 F.3d 419, 420 (1st Cir. 1999).[7]

Under the exclusion, therefore, an employment-related act can occur after the employment relationship has been terminated, and the mere fact of termination is not enough, standing alone, to take the matter outside the exclusion. As some courts have recognized, however, post-termination conduct may be less likely to be employment-related, depending upon the circumstances. *See Low v. Golden Eagle Ins. Co.*, 104 Cal. App. 4th 306, 314 (2002) ("[T]he temporal dimension appears to be one of the handful of factors relevant to the ultimate determination that the events in suit either were, or were not, within the scope of the exclusion."); *Acceptance Ins. Co. v. Lifecare Corp.*, 89 S.W.3d 773, 787 (Tex. App. 2002) ("The situation is further attenuated because the worker was gone. When the employment ended the activity is less likely to be employment related.").

### (3)   The Application of the Employment-Related Exclusion in the Present Case

There remains the difficult question whether the injury here arose out of an employment-related act or omission. The exclusion at issue here, or variations of it, have been interpreted under analogous factual circumstances on multiple occasions. While some of those decisions have focused on the "employment-related act" language, and others on the "arising out of" language, the majority of the decisions have found in favor of the insured. *See, e.g., Barnes v. Employers Mutual Cas. Co.*, No. 03A01-9812-CH-00403, 1999 WL 366587 (Tenn. Ct. App. June 8, 1999) (malicious prosecution of former employee held not to arise out of employment-related act); *Mill Steel Supply Corp. v. Acadia Ins. Co.*, No. 01-C-100, 2002 WL 31059220 (N.H. Super. Ct.

---

[7] That conclusion is reinforced by the subsequent sentence of the exclusion, which provides that the exclusion applies "whether the Insured may be liable as an employer or in any other capacity."

March 7, 2002) (same); *Zurich Ins. Co. v. Smart & Final, Inc.*, 996 F. Supp. 979 (C.D. Cal.

1998) (false imprisonment of former employee held not to arise out of employment-related act);

*Waffle House, Inc. v. Travelers Indem. Co. of Ill.*, 114 S.W.3d 601 (Tex. App. 2003) (defamation

of former employee held not to arise out of employment-related act); *HS Services, Inc. v.*

*Nationwide Mut. Ins. Co.*, 109 F.3d 642, 647 (9th Cir. 1997) (same)[8]; *Great Am. Ins. Co. v.*

*Hartford Ins. Co.*, 621 N.E.2d 796 (Ohio Ct. App. 1993) (invasion of privacy of former employee

held not to arise out of employment-related act); *see also Lawson v. Straus*, 673 So.2d 223 (La.

Ct. App. 1996) (assault, battery, and intentional infliction of emotional distress as to former

employee held not to arise out of personnel practice or act). *But see, e.g., Capital Indem. Corp.*

*v. 1405 Assocs.*, 340 F.3d 547 (8th Cir. 2003) (false arrest of former employee held to arise out of

employment-related act); *State Nat'l Ins. Co. v. Affordable Homes of Troy, LLC*, 368 F. Supp. 2d

1281 (M.D. Ala. 2005) (malicious prosecution and defamation of employee held to arise out of

employment-related act or practice).

     Notwithstanding the trend of the case law, it would certainly be a rational interpretation of

the language to conclude that the act of malicious prosecution in this case falls within the terms of

the exclusion.  As noted above, the principal actors were Clark, a managerial employee of the

company, and Carter, a former employee; they apparently had no relationship outside of the

employment context.  A fair reading of the Carter complaint suggests that Clark was seeking to

vindicate her employer's interests, not her own, when she committed the tortious act.  The

---

[8] *HS Services* was decided under California law, where courts have interpreted the phrase "arising out of" to require a much more direct causal connection, one more akin to proximate cause, than required under Massachusetts law.  *Id.* at 647 ("We hold that to 'arise out of' a termination of employment, the defamatory remark at issue must have been *part of* or *directly and proximately resulted from* the termination.") (emphasis added).

passage of time from the suspension of Carter (January 21) and her termination (February 16) to the alleged tortious act (which occurred at some point between May 20 and June 24) was not significant,[9] and there were no independent intervening events (such as the hiring of Carter by a competitor) to break the chain of causality.

Furthermore, the tortious act, to a significant extent, directly concerned the employment relationship between Peterborough Oil and Carter.  The prosecution of a former employee is, broadly speaking, a form of personnel management—for example, the employer may be sending a message to its remaining employees that it takes employee theft seriously.  Likewise, it could be viewed as a form of employee discipline—for example, the employer may take the position that employees who engage in misconduct will not simply be fired, but pursued criminally or civilly where appropriate.  The injury could therefore be said to arise out of an employment-related act of malicious prosecution.

In addition, there is case law supporting that conclusion.[10]  In *Capital Indemnity Corp. v.*

---

[9] It is not clear which "act" constituted the malicious prosecution.  Presumably, however, it did not occur prior to May 20 (when Clark was advised of the existence of the videotape showing another employee stealing lottery tickets).  Other relevant dates include May 21 (when Clark insisted on going forward notwithstanding the tape), June 21 (when Clark was given a copy of the tape), and June 24 (when the criminal complaint issued).

[10] Although no First Circuit case speaks directly to the issue, what authority there is lends some support to the same conclusion.  In *Parish of Christ Church*, *supra*, the court addressed an exclusion of "personal injury sustained by any person as a result of an offense directly or indirectly related to the employment of such person by the named insured."  In that case, the insurer denied coverage for an action claiming defamation, invasion of privacy, and discrimination in employment brought by a former employee of the church.  166 F.3d at 420.  The former employee's claims were predicated on post-termination statements made by the church minister describing the reasons for the employee's termination.  *Id.*  Reasoning that "defamatory statements providing an explanation for termination or directed to performance are related to employment," the court held that the exclusion applied. *Id.* at 421.  The court characterized the statements to which the underlying complaint referred as "comments as to [the employee's] abilities and job performance" and "explanations as to why [the church] terminated [the employee]." *Id.*  Such statements were therefore at least indirectly, if not directly, related to the former employee's employment. *Id.*

Nonetheless, *Parish of Christ Church* is of limited value as precedent here, in that it involves a different form of exclusion (indeed, one that was framed very broadly, covering offenses that "related directly or indirectly"

*1405 Associates*, 340 F.3d 547 (8th Cir. 2003), the Eighth Circuit considered an employment-related practices exclusion identical to the one involved in the present matter. There, a hotel's former manager left her employment at the hotel without turning over all of the rent receipts she collected prior to departure. *Id.* at 548. The hotel reported that fact to the authorities, and the former manager was arrested. *Id.* After her arrest, the former manager filed an action alleging, among other things, false arrest. *Id.* at 548-49. The court held that the insurer had no duty to defend the action because of the exclusion. *Id.* at 550-51. The court first rejected the argument that the exclusion was inapplicable because the events giving rise to the underlying lawsuit occurred after she terminated her employment. *Id.* at 550. Then, relying on the broad interpretation that Missouri law affords to the phrase "arising out of," which is similar to that applied under Massachusetts law, the court held that a sufficient causal relationship existed between the false arrest of the former manager and her "employment with" the hotel. *Id.*[11]

Nonetheless, the conclusion that the act of malicious prosecution in this case was an "employment-related act" is not the only rational interpretation of the policy. In the present case, the relevant "act," broadly speaking, was Clark's insistence on prosecuting Carter without probable cause. This conduct occurred not in the context of employment, but in the context of a

---

to the employment of the injured person) and a different set of facts (defamation as to the reasons for termination). There was no potential ambiguity as to the application of the exclusion under the facts of that case.

[11] *State National Insurance Company* involved an exclusion nearly identical to the one in the instant case. 368 F. Supp. 2d at 1283-84. The court concluded, without analysis, that a claim arising out of an act of malicious prosecution against an employee fell "squarely" within the exclusion. *Id.* at 1288. The court also cited the definition of a covered "personal injury," which expressly included an injury arising out of "malicious prosecution," in support of its conclusion. *Id.* The same definition, however, applied to both the coverage and the exclusion; the policy covered injuries arising out of an act of malicious prosecution, and the exclusion applied to injuries arising out of an act of malicious prosecution if it also constituted an employment-related act. The definition of "personal injury" thus does not resolve the issue either way.

criminal prosecution. *See HS Services,* 109 F.3d at 646 (finding that the defamation of the former employee was not clearly employment related because, although the content of the defamatory remarks concerned the reasons for his termination, the remarks were made in the context of protecting the employer from competition in the marketplace by the former employee).[12]  How, then, did that "act" concern the employer-employee relationship?  As noted, conceivably, the employer was engaging in a form of personnel management (e.g., "sending a message" to the other employees) or employee discipline (e.g., ensuring that termination is not the only consequence of theft).  It would also be reasonable to conclude, however, that Peterborough Oil was attempting to vindicate criminal justice interests; crime victims routinely press charges even though they have no business or economic motive to do so.  Or to conclude that the company was acting with loss prevention motives—for example, by attempting to secure a criminal conviction to lay the groundwork for a subsequent civil suit, or to facilitate a claim under an employee fidelity policy.  *See Zurich Ins. Co.*, 996 F. Supp. at 988 (the false imprisonment "arose solely in the context of loss prevention" and therefore was not employment-related).

The injury might therefore rationally be said to arise out of an act of personnel management or employee discipline (and thus an "employment-related act or omission") or an act of vindication or loss prevention that happened to involve an employee (and thus not an "employment-related act or omission").  As applied in these circumstances, therefore, the phrase "employment-related act or omission" is inherently ambiguous.  *See Zurich Ins. Co.*, 996 F.

---

[12] The Eighth Circuit in *Capital Indemnity* noted that the injury at issue arose out of the employee's "employment with" the hotel, without elaboration.  But, as noted above, the term "employment-related act" requires that the act directly concern the employment relationship, not merely the fact of employment.  *See Lawson v. Straus*, 673 So.2d at 227.  The court did not explain how the relevant "act" (the report causing the arrest) related to the employment relationship.  Or, to put it another way, the broad interpretation given by the court to the phrase "arising out of" begs the question, "arising out of what?"

Supp. at 988 ("as applied to a false arrest or imprisonment claim, the undefined phrase 'other employment-related practices, policies, acts or omissions' is ambiguous").

In addition, the structure and terms of the policy underscore that ambiguity.  The exclusion lists nine examples of an "employment-related act," including defamation, but does not list malicious prosecution (or, for that matter, false arrest, detention, or imprisonment).  *See Barnes* at *3.[13]  Furthermore, both malicious prosecution and false arrest are specifically covered by the policy generally, but are not specifically mentioned in the exclusion.  The drafters of the policy thus anticipated that the insured might be sued for malicious prosecution; the same drafters must have been aware that the most likely sources of such lawsuits, other than business invitees (such as customers), would be employees.  Indeed, actions by former employees for malicious prosecution or false arrest occur with some frequency.  *See*, *e.g.*, *Foley v. Polaroid Corp.*, 400 Mass. 82 (1987) (action by employee for malicious prosecution, false imprisonment, and defamation).  An insured might therefore reasonably conclude that malicious prosecution actions were covered (looking to the coverage provisions, which mention it) but not excluded when brought by employees (looking to the exclusion, which does not).  *See Zurich Ins. Co.*, 996 F. Supp. at 988 (while the policy defined "personal injury" as including "false arrest, detention or

_____

[13]  The *Barnes* court, which considered the application of an identical exclusion to a claim of malicious prosecution, observed:

> A reasonable interpretation of this exclusion is that the employment-related practices, policies, acts, or omissions are limited to the types of things listed in the provision.  By providing such a list, which includes "coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation or discrimination," the policy indicates that only these types of employment-related matters are covered.  Situations in which the employment relationship is more tenuous would not be covered.

*Id.* at *3.  The court concluded that the exclusion was ambiguous "because the plain and ordinary meaning of the language does not clearly indicate whether malicious prosecution of a former employee is excluded."  *Id.*

imprisonment," the exclusion did not specifically exclude false arrest or imprisonment, although it did specifically exclude other enumerated conduct; accordingly, the insured "undoubtedly had a reasonable expectation of coverage for claims of false arrest or imprisonment").[14]

The exclusion is therefore ambiguous, both because the malicious prosecution in this instance reasonably could be said to be an employment-related act, or not, and because the coverage definition specifically includes "malicious prosecution" but the exclusion does not. As stated above, exclusions must be read narrowly, and any ambiguities in an exclusion are construed strictly against the insurer. *Bravas Sporting Arms*, 220 F.3d at 4-5. Accordingly, the court agrees with the weight of the case law, and concludes that the "employment-related act or omission" exclusion does not apply to the act of malicious prosecution in this case.

## b.    Whether the Injury Arose Out Of an Employee Termination

The remaining issue under the exclusion is whether the injury arose out of "the termination of [Carter's] employment." Great American argues that the exclusion applies because the "prosecution of Carter for larceny of Peterborough funds was 'incident to' or had 'connection with' the termination of her employment by Peterborough."

This argument may be disposed of relatively summarily. The injury in this case did not arise out of the employee's termination; it arose out of an act of malicious prosecution. While it is true that the termination and the malicious prosecution were based on many of the same facts (the

---

[14] Great American also contends that malicious prosecution is "a form of 'coercion,' 'harassment' or 'humiliation,'" and therefore falls within the exclusion. That argument ignores the fact that "coercion" and "harassment" have specific meanings under the law; they are not open-ended words of broad scope. "Humiliation," at least in Massachusetts, is ordinarily a form of injury, rather than a form of tort; in any event, the term in this context surely cannot extend to every tortious act that results in the humiliation of a plaintiff. If malicious prosecution is a form of coercion, harassment, or humiliation, so is virtually every form of tortious conduct.

thefts at the store and Carter's alleged involvement), it does not follow that the latter arose out of the former. Indeed, the fact that Carter had been terminated as of the time of the malicious prosecution was largely irrelevant to the prosecution; had she been suspended rather than fired, it is difficult to see what difference it would have made with regard to the decision to prosecute her. Accordingly, the exclusion of any injury arising out of the termination of Carter's employment does not apply.

* * *

Accordingly, because the alleged injury arose out of an act of malicious prosecution that arose out of the business of Peterborough Oil, and because no exclusion clearly and unambiguously applies, Great American had a duty to defend Peterborough Oil and Clark in the lawsuit brought by Carter.

### C.      Whether Great American Had a Duty to Indemnify the Plaintiffs

The general rule under Massachusetts law is that, "if the insurer fails to defend the lawsuit, it is liable for all defense costs and (assuming policy coverage) the entire resulting judgment or settlement, unless liability can be allocated among covered and uncovered claims." *Liberty Mutual Ins. Co. v. Metropolitan Life Ins. Co.*, 260 F.3d 54, 63 (citing *Liquor Liab. Joint Underwriting Ass'n of Mass. v. Hermitage Ins. Co.*, 419 Mass. 316 (1995); *Palermo v. Fireman's Fund Ins. Co.,* 42 Mass. App. Ct. 283 (1997)). If liability cannot be so allocated, then the insurer is liable for the entire judgment. *See Liquor Liab. Joint Underwriting Ass'n,* 419 Mass. at 324.

The Carter complaint alleged claims of both malicious prosecution and intentional infliction of emotional distress. As explained above, Carter's malicious prosecution claim was covered by the policy, but it is also undisputed that the claim for intentional infliction of emotional

21

distress is not covered.  The jury found against Peterborough Oil and awarded $300,000 in damages to Carter without distinguishing between the two.  Because there is no way to allocate between the covered and noncovered claims, Great American is liable to Peterborough for the entire amount of the judgment.

### D.    The Claims Brought Under Chapter 93A and Chapter 176D

Count 3 of the complaint alleges that Great American engaged in unfair and deceptive acts and practices in violation of Mass. Gen. Laws ch. 93A and unfair insurance claims settlement practices in violation of Mass. Gen. Laws ch. 176D.  Both sides have cross-moved for summary judgment as to that count.

Business plaintiffs under Mass. Gen. Laws ch. 93A, § 11 may bring claims for unfair and deceptive trade practices in connection with insurance claims settlement practices, but § 11 "does not grant an independent right to recover for violations of G.L. 176D, § 3, cl. 9."  *Polaroid Corp. v. Travelers Indem. Co.*, 414 Mass. 747, 754 (1993).  Unlike in the context of consumer plaintiffs under § 9, a violation of chapter 176D is only *evidence* of a violation of chapter 93A, § 11.  Thus, Peterborough Oil and Clark must prove that Great American's failure to defend was an unfair or deceptive business practice in violation of chapter 93A, § 2.  *See Brazas Sporting Arms*, 200 F.3d at 10 ("Conduct that violates ch. 176D may independently be an unfair trade practice actionable under ch. 93A, § 11.");  *Continental Ins. Co. v. Bahnan*, 216 F.3d 150, 157 (1st Cir. 2000) ("There is no one-to-one relationship between chapter 176D and chapter 93A.  After all, violations of chapter 176D run the gamut from those that are somewhat technical to those that are gravely offensive.  Given this range, conduct that abridges the unfair claim practices statute may or may not violate the unfair trade practice statute.");  *Polaroid Corp.*, 414 Mass. at 754

("Polaroid's claim that G.L. c. 93A, § 11, was violated by its primary insurers' violations of certain provisions of G.L. c. 176D, § 3 cl. 9, is of significance only to the extent that the alleged wrongful conduct was a violation of G.L. c. 93A, § 2 ('unfair or deceptive acts or practices').").

If Great American improperly denied coverage but its disclaimer was based on a reasonable or plausible interpretation of the policy, it did not violate chapter 93A. *Polaroid Corp.*, 414 Mass. at 754 ("[A]n insurer could reasonably have concluded that no aspect of [the] claims were within the scope of its coverage and that, therefore, there was no duty to defend. . . . In such circumstances, an insurer's refusal to defend, even if ultimately determined to be wrong, does not support a claim under G.L. c. 93A") (citations omitted); *see also Gulezian v. Lincoln Ins. Co.*, 399 Mass. 606, 613 (1987) ("An insurance company which in good faith denied a claim of coverage on the basis of a plausible interpretation of its insurance policy is unlikely to have committed a violation of G.L. c. 93A).

Here, Great American's interpretation of the exclusion was incorrect, but it was hardly unreasonable. Its position was supported by case law, and did not ignore either the clear terms of the policy language or any salient facts. Indeed, the court's ruling is based on the ambiguity of the exclusion, and reflects a close decision based on a difficult set of circumstances. Plaintiffs cannot prove that coverage was so obvious (i.e., that Great American's interpretation was so objectively unreasonable) that the failure to defend was an unfair or deceptive act or practice within the meaning of ch. 176D or ch. 93A.

## III.    Conclusion

For the reasons set forth above, plaintiffs' motion for summary judgment is GRANTED IN PART and DENIED IN PART, and defendant's motion is GRANTED IN PART and

DENIED IN PART.   Summary judgment is granted in favor of the plaintiffs as to Counts 1 and 2

and in favor of the defendant as to Count 3.

**So Ordered.**




                                            /s/ F. Dennis Saylor
                                            F. Dennis Saylor IV
                                            United States District Judge

Dated: September 14, 2005